UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONAHUE DEWAR,

                                    Petitioner,

            v.

UNITED STATES OF AMERICA,

                                    Respondent.

Case No. 17-CV-2330 (KMK)
Case No. 06-CR-311-1 (KMK)

<u>ORDER</u>

KENNETH M. KARAS, United States District Judge:

Pro se Petitioner Donahue Dewar ("Petitioner") has filed a Petition, pursuant to 28 U.S.C.

§ 2255, to vacate, set aside or correct his sentence (the "Petition"). (*See* Petition ("Pet.") (Dkt.

No. 172).)[1] For the reasons stated herein, the Petition is denied in part.

<u>I. Background</u>

On February 19, 2008, Indictment S2 06 Cr. 311 was filed, charging Petitioner with six

counts of drug and firearm-related crimes. (Resp't's Mem. in Opp'n to Pet. ("Resp't's Mem.") 2

(Dkt. No. 218); *see also* Indictment S2 (Dkt. No. 56).) Count One charged Petitioner with

conspiring to distribute five kilograms and more of cocaine and a quantity of marijuana, in

violation of 21 U.S.C. § 846; Counts Two and Three charged Petitioner with possession of 500

grams and more of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 812, 841(a)(1),

and 841(b)(1)(B), and 18 U.S.C. § 2; Count Four charged Petitioner with possessing a quantity

of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 812, 841(a)(1), and

841(b)(1)(D), and 18 U.S.C. § 2; Count Five charged Petitioner with possessing a firearm in

---

[1] Docket numbers refer to the criminal docket, Case No. 06-CR-311-1, unless noted
otherwise.

furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A)(i); and

Count Six charged Petitioner with possessing a firearm after having been convicted of a felony,

in violation of 18 U.S.C. §§ 922(g)(1) and (2). (*See* Resp't's Mem 2; Indictment S2.)

A. Trial, Verdict, and Sentencing

The case was tried before the Honorable Stephen C. Robinson, who bifurcated it into

Counts One through Five, followed by the felon-in-possession charge in Count Six. (Resp't's

Mem. 1, 3.) The prosecution's evidence at trial relied in large part on the cooperation of Robert

Roper ("Roper"), a former cocaine dealer who testified pursuant to an agreement with the

Government. (*See id*.) Roper testified that Dewar and co-defendant Sharon King ("King") were

drug traffickers in the Bronx, New York from 2002 or 2003 to at least August 2005, when Roper

was arrested. (*See id*. (citing to Trial Tr. 103–75).) Roper noted that Petitioner and King's

supplier was a man in Houston, Texas. (*Id*. (citing to Trial Tr. 121–25).) Roper testified that he

had personally witnessed Petitioner pack cash in carbon paper, dryer sheets, and plastic wrap to

send to their supplier by Federal Express as payment for the drugs. (*Id*. (citing to Trial Tr. 127–

32).)

Other evidence corroborated Roper's trial testimony. For example, Federal Express

records showed that numerous packages had been delivered from Houston to Petitioner's and

King's residence. (*See id*. at 3–4.) King's bank records showed that numerous checks had been

written to Federal Express during the relevant period of time. (*See id*. at 4 (citing to GX 105,

105A, 105B).) A Houston police officer also testified that in June 2004, he had seized some

Federal Express packages that contained cash packed in carbon paper, dryer sheets, and plastic

wrap and were addressed from "Arnett Forbes," a name that appeared on a receipt that was later

found in Petitioner and King's residence. (*See id*. (citing to Trial Tr. 437–49; GX 51F, 91–95).)

That officer also testified that an individual was arrested attempting to retrieve the packages from a Federal Express facility in Houston. (*See id*. (citing to Trial Tr. 438–49).) This was consistent with Roper's testimony regarding a conversation between Roper and Petitioner where Petitioner had mentioned that a package of money in Texas was missing and that an individual had been arrested as a result. (*See id*. (citing to Trial Tr. 131–32).)

Following Roper's arrest in August 2005, he began cooperating with the police department of Harrison, New York, and engaged in a number of monitored and/or recorded telephone conversations with Petitioner and King, during which the three discussed setting up a cocaine deal. (*See id*. (citing to Trial Tr. 158–72; GX 6–9).) These conversations culminated in an agreement of Petitioner supplying Roper (for a buyer Roper had purportedly procured) with three kilograms of cocaine on August 28, 2005. (*See id*. at 5 (citing to Trial Tr. 158–75; GX 6–8, 6T–8T).) Roper and Petitioner decided to meet at a sporting goods store in Pelham Manor, New York. (*See id*. (citing to Trial Tr. 171; GX 9, 9T).) The surveillance team monitoring Petitioner's residence observed Petitioner and his brother, Charles Dewar, leave Petitioner and King's residence with a plastic bag. (*See id*. (citing to Trial Tr. 37–38, 291–92).) Petitioner and his brother drove towards Pelham Manor. (*See id*. (citing to Trial Tr. 37–40, 291–92).) The police officers pulled the vehicle over just as Petitioner and his brother were about to enter the shopping center with the sporting goods store at which Roper and Petitioner had agreed to meet. (*See id*. (citing to Trial Tr. 39–40, 43–48; GX 1–2).) During the arrest, the police officers seized a plastic bag in the floorboard in front of the seat where Petitioner's brother had been sitting; the plastic bag contained three kilograms of cocaine. (*See id*. (citing to Trial Tr. 39–41, 532–38; GX 5A, 5B, 5C).)

Following that arrest, police officers arrested King at Petitioner and King's residence and conducted a search of the residence pursuant to a search warrant. (*See id.* at 6 (citing to Trial Tr. 293–94, 372–74).) During that search, police officers found a kilogram of cocaine, a kilogram of marijuana, several large shipping drums that smelled of marijuana, $70,000 in cash, receipts and shipping labels from Federal Express and UPS, handwritten lists of Federal Express stores located around Manhattan, a sophisticated surveillance system, and four loaded guns in the residence. (*See id.* (citing to Trial Tr. 326–31, 377–81, 383–84, 387–88, 538–41, 653–66, 698–98).) At trial, Petitioner did not testify or call any witnesses on his behalf. (*See id.*)

At trial, Petitioner's attorney, Andrew Rubin, Esq. ("Rubin"), questioned Roper's credibility and law enforcement's conduct. (*See id.* at 6–7.) For example, in closing, Rubin said, "You know what [] Roper's word is worth. He tells the government what he wants them to know." (*Id.* at 7 (quoting Trial Tr. 927).) He also argued that the "vague" evidence could not prove that "there was ever even cocaine in that car." (*Id.* (quoting Trial Tr. 938).) Rubin also argued that "[p]olice officers are the same as anybody else and they don't always tell the truth," questioning whether the guns were really in Petitioner's house before the police officers entered to conduct their search. (*Id.* (quoting Trial Tr. 938, 940).)

After a few hours of deliberation, the jury found Petitioner guilty of Counts One through Five. (*See id.* (citing to Trial Tr. 1105–08).) The prosecution presented evidence of Petitioner's conviction for the purpose of Count Six, felon in possession of a firearm. (*See id.* (citing to GX 113).) Petitioner's counsel moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. (*See id.* (citing to Trial Tr. 1115–17).) Judge Robinson granted Petitioner's motion. (*See id.* (citing to Trial Tr. 1117–18).)

On November 25, 2008, Petitioner appeared before Judge Robinson for sentencing.  (*See id*. at 8.)  Petitioner faced mandatory minimum sentences of 240 months' imprisonment on Count One and 120 months' imprisonment on each of Counts Two and Three because the Government had field prior felony information against Petitioner before trial.  *See* 21 U.S.C. §§ 841(b)(1)(A), (B).  Judge Robinson found that the enhanced mandatory minimum sentences were applicable because Petitioner had a prior felony.  (*See* Nov. 2008 Sentencing Tr. 7–13 (available at Dkt. No. 126-1).)  Judge Robinson did not conduct the requisite colloquy pursuant to 21 U.S.C § 851(b) to determine whether Petitioner affirmed or denied the existence of the prior conviction.  (*See generally id*.)  Petitioner did not object on grounds pertaining to the failure to conduct the colloquy, and in fact, Petitioner's counsel assumed that the mandatory minimum did apply.  (*See id*. at 24 (noting that one issue was "not as significant in view of the twenty-year mandatory minimum"), 34 ("[A]lthough his prior is causing him to have this . . . mandatory minimum, in effect, he has got one prior conviction.").)  Judge Robinson further concluded, over the Government's argument to the contrary, that a mandatory *consecutive* 60-month sentence for Count Five, pursuant to 18 U.S.C. § 924(c), did not apply.  (*See id*. at 7–13.)  Therefore, Judge Robinson sentenced Petitioner, inter alia, to 240 months' imprisonment on each of Counts One, Two, and Three and a term of 60 months' imprisonment on Counts Four and Five, all to run concurrently.  (*See id*. at 45; *see also* Judgment (Dkt. No. 82).)

B.  Subsequent Procedures

Petitioner appealed his conviction and sentence, and the Government cross-appealed. Petitioner challenged the decision not to suppress evidence found in his vehicle and certain jury instructions, while the Government challenged Judge Robinson's decision not to impose a consecutive sentence under § 924(c) for Count Five.  (*See* Resp't's Mem. 9.)  The Second Circuit

affirmed the conviction and sentence, noting that Judge Robinson's decision was appropriate under then-existing Second Circuit precedent permitting judges to impose a concurrent mandatory minimum sentence pursuant to § 924(c). *United States v. Dewar*, 375 F. App'x 90, 94 (2d Cir. 2010) ("[W]e conclude that the district court properly declined to impose the consecutive sentences provided in § 924(c)."). However, the Government petitioned the Supreme Court for a writ of certiorari on the § 924(c) sentencing issue, and the Supreme Court granted certiorari. In *United States v. Dewar*, 562 U.S. 1254 (2011), the Supreme Court vacated the Second Circuit's judgment below and remanded the matter for further consideration in light of *Abbott v. United States*, 562 U.S. 8 (2010). *Dewar*, 562 U.S. 1254; *see also Abbott*, 562 U.S. at 13 ("We hold, in accord with the courts below, and in line with the majority of the Courts of Appeals, that a defendant is subject to a mandatory, consecutive sentence for a § 924(c) conviction, and is not spared from that sentence by virtue of receiving a higher mandatory minimum on a different count of conviction.").[2] On remand, the Second Circuit affirmed Petitioner's conviction but vacated and remanded the sentence "for the limited purpose of allowing the district court to impose [a] sentence[] in accord with . . . *Abbott* . . . ." *United States v. Dewar*, 420 F. App'x 95, 96–97 (2d Cir. 2011).

---

[2] On June 24, 2019, the Supreme Court held that § 924(c)(3)(B) was unconstitutionally vague because of the language defining a "crime of violence" as a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *See United States v. Davis*, 139 S. Ct. 2319, 2324, 2336 (2019) (citation and quotation marks omitted). However, this holding does not pertain to the portion of the clause under which Petitioner received his 60-month sentence, i.e., the portion that instructs courts to apply the 60-month sentence to defendants who were involved in a *drug trafficking* crime. *See* 18 U.S.C. § 924(c)(1)(A). Moreover, the issues presented in *Davis* are not relevant to the disposition of this Petition, which centers on representation issues in other aspects of Petitioner's criminal proceedings.

Subsequently, this Court took over the case from Judge Robinson. (*See* Dkt. No. 108.) On April 16, 2013, this Court sentenced Petitioner to a term of 240 months' imprisonment on Counts One, Two, and Three, and 120 months' imprisonment on Count Four, all to run concurrently, along with a term of 60 months' imprisonment on Count Five, to run consecutive to the sentence on Counts One through Three. (*See* Apr. 2013 Sentencing Tr. 60–61; *see also* Amended Judgment (Dkt. No. 151).) During that hearing, this Court also found that the Government had "proved conclusively" the existence of the prior conviction, a finding that Judge Robinson had not made because he had neglected to conduct a § 851 colloquy. (*See* Resp't's Mem. 10; Apr. 2013 Sentencing Tr. 45.)

Petitioner appealed again, claiming that the Court had exceeded the Second Circuit's mandate when it made a § 851 finding. The Second Circuit affirmed the sentence but noted that its remand "was narrowly limited to imposing a consecutive sentence for the § 924(c) charge." *United States v. Dewar*, 624 F. App'x 59, 60 (2d Cir. 2015) ("[Petitioner's] challenge . . . is moot because the original sentencing judge made clear that the 240-month sentence would be imposed regardless of whether Dewar was a prior offender. . . . [A]ny hearing on the prior felony was not an error that requires yet another remand for yet another resentencing." (citation omitted)).

On November 4, 2015, the United States Probation Office issued a memorandum stating that because Petitioner had been sentenced to the mandatory minimum term of 240 months' imprisonment, he was ineligible for a reduction in sentence and that, therefore, the Office would not issue a supplemental report addressing Petitioner's eligibility. (*See* Resp't's Mem. 11.) The Court issued an Order upon its own Motion pursuant to 18 U.S.C. § 3582(c)(2) indicating that Petitioner was ineligible for a reduction because he was already sentenced to the mandatory minimum term. (*See* Dkt. No. 157.) Petitioner appealed this Order. The Second Circuit vacated

the Order in *United States v. Dewar*, 706 F. App'x 36 (2d Cir. 2017). 706. F. App'x at 38

("[W]e have twice determined implicitly that [Petitioner's] 24-month sentence for his narcotics

count was not based on a mandatory minimum, but rather on the applicable guidelines range

used at his original sentencing. Because Amendment 782 lowered the offense levels for the . . .

basis for [Petitioner's] original guidelines range, he is eligible for a sentence reduction."). In

light of that holding, on April 18, 2018, the Court sentenced Petitioner to 135 months'

imprisonment on all narcotics counts, to run concurrently, and 60 months' imprisonment on

Count Five, to run consecutively. (*See* Dkt. No. 191.)

## II. Discussion

### A. Standard of Review of a § 2255 Petition

A prisoner in federal custody may move to vacate, set aside or correct his sentence only

"upon the ground that the sentence was imposed in violation of the Constitution or laws of the

United States, or that the court was without jurisdiction to impose such sentence, or that the

sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral

attack." 28 U.S.C. § 2255(a).[3] "Because collateral challenges are in tension with society's

strong interest in the finality of criminal convictions, the courts have established rules that make

it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack."

*Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (citation and quotation marks

---

[3] Title 28 U.S.C. § 2255(a) provides in full:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

omitted).  To prevail on a collateral attack of a final judgment under § 2255, a petitioner must demonstrate either the existence of a "constitutional error, . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (citations and quotation marks omitted); *accord Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000).

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *accord Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013).  A hearing is not required where the petitioner's allegations are "vague, conclusory, or palpably incredible."  *Machibroda v. United States*, 368 U.S. 487, 495 (1962).  Instead, to justify a hearing, the petition must set forth "specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief."  *See Gonzalez*, 722 F.3d at 131.

### B.  Analysis

Petitioner argues that trial counsel was ineffective for (1) failing to call his brother, Charles Dewar, to testify that it was Charles who was recorded on several phone calls discussing the August 28, 2005 drug transaction, and (2) failing to contest the validity of Count Five. Petitioner also argues that Rubin and counsel prior to Rubin, Bruce Barket, Esq. ("Barket") were ineffective for failing to obtain or secure a plea agreement with the Government.  (*See* Pet. 4–20.)  Lastly, Petitioner argues that his conviction and sentence on the narcotics charges are invalid because the jury was not asked to find whether Petitioner knew the type of controlled substance at issue.  (*See id*. at 20–22.)

## 1. Standard of Review of Ineffective Assistance Claims

Claims of ineffective assistance of counsel are evaluated under the framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the [petitioner] must show that counsel's performance was deficient." *Id*. at 687. "Second, the [petitioner] must show that the deficient performance prejudiced the defense." *Id.*

Petitioner will not meet the first prong based solely on disagreements with counsel's strategy or advice. Indeed, there is a "strong presumption" that counsel's conduct fell within the vast spectrum of reasonable assistance, and it is Petitioner's burden to demonstrate "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (citation omitted); *see also Bonilla v. Lee*, 35 F. Supp. 3d 551, 575 (S.D.N.Y. 2014) (same); *Henderson v. Martuscello*, No. 10-CV-5135, 2013 WL 6463348, at *15 (S.D.N.Y. Dec. 10, 2013) ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, even where counsel adopts a course of action (or inaction) that seems risky, unorthodox[,] or downright ill-advised." (citation, alteration, and quotation marks omitted)). Thus, to satisfy this prong, Petitioner must demonstrate that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In assessing counsel's conduct, "a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (one citation omitted) (quoting *Strickland*, 466 U.S. at 690).

With respect to the "prejudice" prong, "the [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding below would have been different." *United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir. 2010) (citation, alteration, and quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693 (citation omitted). "'[P]urely speculative' arguments about the impact of an error do not establish prejudice." *DeCarlo v. United States*, No. 11-CV-2175, 2013 WL 1700921, at *4 (S.D.N.Y. Apr. 17, 2013) (alteration in original) (quoting *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir.1991)). Measuring this probability depends on the context of the alleged error. Where the challenge is to a guilty plea on the basis of ineffective assistance of counsel, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial." *United States v. Cuoto*, 311 F.3d 179, 187 (2d Cir. 2002) (citation and quotation marks omitted), *abrogated on other grounds by Padilla v. Kentucky*, 599 U.S. 356 (2010). The converse also applies. That is, where a guilty plea was offered, but the petitioner went to trial instead, the petitioner shows prejudice by presenting some "objective evidence that [the] petitioner would have accepted a plea offer" had counsel properly informed the petitioner about the existence of the plea or the consequences of going to trial. *United States v. Gordon*, 156 F.3d 376, 380–81 (2d Cir. 1998) (citation and quotation marks omitted); *see also Naranjo v. United States*, Nos. 16-CV-7386, 13-CR-351, 2019 WL 756186, at *10 (S.D.N.Y. Dec. 16, 2019) (noting that the

petitioner's ineffective assistance claim failed because the petitioner failed "to establish a reasonable probably that he would have accepted" any plea offer (citation omitted)), *adopted by* 2020 WL 174072 (S.D.N.Y. Jan. 13, 2020).

### a.  Charles Dewar's Testimony

Petitioner argues that counsel should have called Charles Dewar as a witness to challenge the credibility of Roper's testimony.  (Pet. 4.)  According to Petitioner, Charles Dewar would have impeached Roper's testimony by testifying that it was Charles on the phone with Roper, not Petitioner.  (*Id*. at 8.)  In support of this, Petitioner attaches an Affidavit from Charles Dewar in which Charles Dewar claims that he was the person on the phone conversing with Roper prior to the anticipated drug deal in August 2005 where Petitioner and Charles Dewar were arrested and that he was "willing and ready to speak the truth" at trial but was never subpoenaed to appear. (*See* Pet. Ex. A ("Charles Dewar Aff.") ¶ 11 (Dkt. No. 172-1).)

Petitioner's claim lacks merit.  It is well-established that "[t]he decision whether to call any witnesses on behalf of [a] defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial" and that such decisions "fall squarely within the ambit of trial strategy," which, if "reasonably made, will not constitute a basis for an ineffective assistance claim."  *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *see also Barbarino v. United States*, Nos. 10-CR-476, 15-CV-8387, 2017 WL 1378251, at *4 (S.D.N.Y. Apr. 11, 2017) (same).  The Second Circuit has especially noted its "reluctance to second-guess matters of trial strategy simply because the chosen strategy was not successful," *Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir. 1983), and that the "tactical decision of whether to call specific witnesses—even ones that might offer exculpatory

evidence—is ordinarily not viewed as a lapse in professional representation," *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997).

Here, counsel's trial strategy, including his decision not to call Charles Dewar to the stand, was clearly reasonable. To begin, trial counsel did argue to the jury that there was no evidence connecting Petitioner to the phone number used for the recorded calls, and that only Roper's testimony provided any evidence that it was Petitioner on the other end of the calls. (*See* Resp't's Mem. 15–16 (citing to Trial Tr. 926).) Trial counsel also argued that the Government had made no connection between the phone records and numbers it presented and Petitioner himself. (*See id.* at 16 (citing to Trial Tr. 926, 937).) These arguments sought to question the credibility of Roper's testimony and the strength of the Government's evidence connecting Petitioner to the telephone evidence presented during trial. Furthermore, calling Charles Dewar to the stand could have opened the door to damaging impeachment material. For example, during Charles Dewar's guilty plea allocution, he claimed he "didn't know where [he] was going" or to whom they were delivering the drugs in August 2005, suggesting that Petitioner, the only other individual in the car at the time, was the one aware of the specifics of the transaction. (*See* Charles Dewar Plea Allocution Tr. 22–23 (Dkt. No. 39, Case No. 06-CR-311-2).) Moreover, after the prosecution summarized the evidence against Charles Dewar at his allocution, which included the assertion that there was a call between Roper and *Petitioner* regarding the anticipated drug deal in August 2005, Charles Dewar confirmed that he had heard and understood what the prosecutor had said and had no questions to raise with either the Court or his attorney. (*Id.* at 27, 29.) Therefore, Charles Dewar's supposed testimony could have been seriously impeached by what was said and confirmed during his plea allocution. Given that not calling Charles Dewar was the type of tactical decision that almost never qualifies as

constitutional error and that there was significant impeachment material that the Government

could have used to challenge Charles Dewar had he been called, trial counsel's decision not to

call him to the stand does not come close to meeting the high bar required for ineffective

assistance of counsel claims.[4]  Accordingly, this portion of the Petition is not legally cognizable.

*See United States v. Higgins*, Nos. 13-CR-155, 18-CV-5433, 2019 WL 697293, at *5 (S.D.N.Y.

Feb. 20, 2019) (noting that "a failure to call a witness for tactical reasons of trial strategy does

not satisfy the standard for ineffective assistance" (alteration and quotation marks omitted)

(quoting *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002))), *denying cert. of*

*appealability*, No. 19-817 (2d Cir. Sept. 4, 2019), *cert. denied*, —S. Ct.— , 2020 WL 871797

(Feb. 24, 2020); *United States v. Borrero*, No. 13-CR-58, 2014 WL 1918607, at *2 (S.D.N.Y.

May 12, 2014) (holding that counsel was not ineffective for failing to call a witness that "would

be subject to a withering cross examine based on [the witness's] and his co-defendants' plea

allocutions").

### b.  Count Five

Petitioner appears to argue that counsel was ineffective for failing to object to the

wording of Count Five in his Indictment, which, in Petitioner's view was "duplicitous" because

it posited two potential bases for criminal liability—(1) possession of a firearm in furtherance of

a drug and trafficking crime, and (2) use and carry of a firearm during and in relation to a drug

trafficking crime.  (Pet. 17–20.)  Petitioner also appears to argue that trial counsel was ineffective

---

[4] Furthermore, it is unlikely that Petitioner would be able to show that there was a
reasonable probability of a different outcome had his brother testified on his behalf, given the
overwhelming evidence implicating Petitioner with the crime at trial.  *See Ward v. Herbert*, 509
F. Supp. 2d 253, 269 (W.D.N.Y. 2007) ("The Court is not persuaded that testimony from a co-
defendant that he and [the petitioner] simply 'didn't do it,' without more, would have resulted in
a more favorable outcome.").

for failing to argue that there was no proof that Petitioner used or carried a firearm to protect his drug business.  (*Id*. at 17.)

These claims also lack merit.  First, the charging language tracks the statutory language present in the underlying criminal statute.  *Compare* 18 U.S.C. § 924(c)(1)(A) (noting that any person "who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" faces a term of imprisonment of "not less than 5 years") *with* Indictment S2, at 4 ("[T]he defendants unlawfully, willfully, and knowingly, used and carried a firearm during and in relation to a drug trafficking crime . . . , and in furtherance of such crimes, possessed a firearm . . . .").  Therefore, any objection to the language of the indictment would have been frivolous and unlikely to be successful.  *See United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) ([T]o satisfy . . . pleading requirements . . . , an indictment need do little more than to track the language of the statute charged . . . ." (citation and quotation marks omitted)).  Moreover, legally, "[a] single count that alleges commission by a defendant of a crime by several means is not duplicitous . . . ."  *United States v. Barret*, No. 10-CR-809, 2011 WL 6780901, at *2 (E.D.N.Y. Nov. 27, 2011) (citation omitted).  "The Second Circuit has explained that where there are several ways to violate a criminal statute, as is the case with [§] 924(c), federal pleading *requires* that an indictment charge be in the conjunctive to inform the accused fully of the charges."  *Id.* (emphasis in original) (citations, alterations, and quotation marks omitted); *see also* Fed. R. Crim. P. 7(c)(1) ("A count may allege . . . that the defendant committed [the offense] by one *or more* specified means." (emphasis added)).  Because counsel was "not required to engage in the filing of futile or frivolous motions," *Nersesian*, 824 F.2d at 1322 (citation omitted), Petitioner's counsel's failure to object to the language of Count Five—if considered a failure at all—certainly

does not rise to the level of constitutionally ineffective assistance. Therefore, the Court dismisses Petitioner's ineffective assistance claim on this ground.

Petitioner also takes issue with trial counsel's failure to argue that Petitioner had used or carried firearms to protect his drug business. (*See* Pet. 17.) To begin, Count Five provides for an alternative basis of liability to use of a firearm during drug trafficking activity, including "possess[ing] a firearm" in "furtherance" of drug crimes. *See* 18 U.S.C. § 924(c)(1)(A). Moreover, trial counsel did make arguments seeking to question the reliability of the evidence connecting Petitioner's drug business to the firearms in question. For example, trial counsel argued that there was some doubt as to whether the firearms were planted in Petitioner's house because there were some inconsistencies between police paperwork and officer testimony regarding the firearms. (*See* Resp't's Mem. 21 (citing to Trial Tr. 939–40).) Trial counsel pointed out that Petitioner was not carrying any of the guns with him when he went to make the deal with Roper in August 2005 and that, instead, the guns were found at his home, arguing that there was significant doubt as to whether the Government had sufficiently proven the connection between Petitioner's firearms and his drug business. (*See id.* (citing to Trial Tr. 941).) These were reasonable arguments that fall within the "countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. Indeed, trial counsel was trying to make the very point that Petitioner says counsel did *not* make—i.e., that the evidence connecting Petitioner's firearms to his drug trafficking business was lacking. That the arguments did not ultimately persuade the jury does not make trial counsel's work constitutionally ineffective. *See Rosario-Dominguez v. United States*, 353 F. Supp. 2d 500, 515 (S.D.N.Y. 2005) ("Counsel's performance cannot be found deficient for failing to make arguments that he did in fact make."). To the extent Petitioner's counsel made different arguments than Petitioner would have made on the

same point, "[i]t is the very function of an effective legal counselor to select among the available arguments" and choose the most persuasive ones, avoiding "cluttering the court with unnecessary arguments that would dilute the force of the stronger ones." *Weingarten v. United States*, 865 F.3d 48, 53 (2d Cir. 2017) (citation and quotation marks omitted). This Court "may not second-guess reasonable professional judgments and impose on counsel a duty to raise every colorable claim suggested by a client." *Id.* (alteration and quotation marks omitted) (quoting *Jones v. Barnes*, 463 U.S. 745, 754 (1983)). As counsel made reasonable arguments regarding Count Five, the Court also declines to find that trial counsel was constitutionally ineffective on this ground.[5]

### c. Plea Bargaining

Petitioner appears to argue that counsel was ineffective for failing to negotiate or secure a plea agreement from the Government. (*See* Pet. 10–16.) To support this argument, Petitioner states that "he would have accepted a plea bargain" and in fact requested that counsel "initiate plea negotiations." (*Id.* at 16.)

To begin, criminal defendants have "no right to be offered a plea, nor . . . that the judge accept it." *Missouri v. Frye*, 566 U.S. 134, 148–49 (2012) (citations omitted). A defendant has the right to effective assistance, as defined in *Strickland*, when considering whether to accept a plea bargain "*[i]f a plea bargain has been offered.*" *Lafler v. Cooper*, 566 U.S. 156, 168 (2012)

---

[5] The Court notes that the Second Circuit has also explained that "possession [of a firearm] for personal protection does not preclude possession in furtherance of a drug trafficking offense." *United States v. Lewter*, 402 F.3d 319, 322–23 (2d Cir. 2015). Where, as here, evidence indicated that the firearms were protecting "a drug dealer," along with "a saleable quantity of drugs . . . , and the proceeds of drug trafficking," the requisite "nexus between the firearm and the drug selling operation" may be established. *Id.* at 322, 323 (citation and quotation marks omitted). Law enforcement discovered a kilogram of cocaine, a kilogram of marijuana, $70,000 in cash, drug ledgers, and a sophisticated surveillance system in Petitioner's residence, where the firearms were also found, creating a nexus between the firearms and Petitioner's drug business. (*See* Resp't's Mem. 8 (citing to relevant portions of the trial record).)

(emphasis added). Moreover, where a plea has been offered, although "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," the record must also show a "reasonable probability" that the defendant would have accepted such an offer, that the "plea would have been entered without he prosecution cancelling it[,]" and that it would have resulted in "a plea to a lesser charge or a sentence of a less prison time." *Frye*, 566 U.S. at 145, 147. Although Petitioner cites *Lafler* in support of his Petition, the *Lafler* court itself specified that a pre-requisite to applying the *Strickland* standards to counsel's assistance in the context of a plea bargain requires that a plea offer was actually made. *Lafler*, 566 U.S. at 168 ("If no plea offer is made, . . . the issue [of counsel's ineffective assistance] simply does not arise."). Moreover, a plea offer does not encompass "informal" plea discussions that occur before any formal offer is extended to a criminal defendant. *See, e.g.*, *Mavashev v. United States*, No. 11-CV-3724, 2015 WL 1508313, at *9 (E.D.N.Y. Mar. 31, 2015) ("Any attempt to extend *Lafler* to an informal plea offer must be rejected, as the distinction between formal plea offers and informal plea offers is significant."); *Speed v. United States*, Nos. 12-CV-7777, 10-CV-3333, 04-CR-336, 2013 WL 416026, at *3 (S.D.N.Y. Feb. 3, 2014) ("Moreover, counsel had no duty to inform [the] petitioner of any plea offer when no such offer existed." (citation omitted)). This is in part because "[w]ith no plea offer, it would be baseless and speculative to consider what such an offer might have contained or the length of any subsequent sentence." *Speed*, 2013 WL 416026, at *3 (citation omitted).

Here, Petitioner had the assistance of two different lawyers over the course of his criminal proceedings. Barket had represented Petitioner in connection to the initial state criminal charges and, at first, continued his representation of Petitioner in the federal case. (*See* Resp't's Mem. 23.) However, by October 29, 2007, the relationship between Petitioner and Barket had

soured, and Barket moved to withdraw as counsel at a pretrial conference. (*See id.* (citing to Oct.

29, 2007 Tr. 8–9).) At that conference, Barket noted that part of Petitioner's dissatisfaction was

due to Barket's failure to secure a plea agreement in the state proceeding before the federal

authorities took over the case and appeared to offer a less favorable plea. (*See* Oct. 29, 2007 Tr.

9–10.) Barket specifically noted that he hoped the case would "resolve[] itself in terms of a

plea" and that he did not think the case should go to trial. (*Id.* at 12.) Barket also informed

Judge Robinson that Petitioner had become unresponsive even as to "basic questions about how

to proceed." (*See id.* at 11.) Judge Robinson granted the motion to withdraw.

Rubin then began to represent Petitioner. Rubin also affirms that Petitioner frequently

refused to communicate with him about pretrial decisions and strategies. (*See* Aff. of Rubin

("Rubin Aff.") ¶¶ 3–4 (Dkt. No. 219-1).) Rubin states that although he informed Petitioner of a

plea offer from the Government, Petitioner informed Rubin that he would be willing to plead

only if the Government either dismissed his co-defendant, King, or allowed her to plead guilty in

exchange for a non-incarceration sentence. (*See id.* ¶ 8.) The Government informed Rubin that

such an agreement would be "out of the question." (*Id.* ¶ 9.) Therefore, Petitioner and King

rejected the one plea offer that Rubin received. (*Id.* ¶ 10.) Rubin also provided a letter to

Petitioner dated May 30, 2008, informing him of the consequences of pleading guilty and

advising him that "the case against [him] is very strong and there is a good likelihood of

conviction." (*Id.* Ex. A ("Rubin Ltr.") 2 (Dkt. No. 219-1).) Rubin also advised Petitioner to take

the plea instead of going to trial. (*See id.*) Other than the offer documented in Rubin's Affidavit

and Letter, which Petitioner rejected because of his desire to negotiate for leniency towards

King, Petitioner has not presented *any* evidence that a formal offer was extended to him. The

Government has found an unsigned draft plea agreement, but no official offers within their case

file.  (*See generally* Pet.; Pet.'s Aff'n (Dkt. No. 173); *see also* Resp't's Mem. 25–26.)

Based on the record, the Court can determine that Rubin was not ineffective in his assistance to Petitioner regarding any plea offer.  In fact, the record shows that Petitioner himself refused the one plea offer that the Government offered because of his desire to obtain non-incarceration consequences for King.  (*See* Rubin Aff. ¶¶ 9–10.)  Rubin provided Petitioner with guidance on the potential consequences of pleading and not pleading and advised Petitioner that, should he want to take the Government up on its offer, he needed to contact Rubin "immediately."  (Rubin Ltr.)  Petitioner does not deny that he received this letter, but instead states that he wished he had received further explanation.  (*See* Pet.'s Aff'n ¶ 8.)  However, Rubin's performance with regard to the one recorded plea offer during his tenure in the underlying criminal proceedings satisfies the standard for effective assistance on plea agreements, which requires counsel only to "communicate to the defendant the terms of the plea offer and [to] usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed."  *Thomas v. United States*, Nos. 15-CR-667-10, 17-CV-6877, 2020 WL 1285622, at *6 (S.D.N.Y. Mar. 18, 2020) (citing *Purdy v. United States*, 208 F.3d 41, 44–45 (2d Cir. 2000)).  Here, Petitioner's counsel "communicate[d the] plea offer to [Petitioner, and] . . . provide[d] objectively reasonable advice about" it.  *Id.* (citing, inter alia, *Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999)); *see also Mateus v. United States*, No. 18-CV-638, 2020 WL 1046624, at *7–8 (S.D.N.Y. Mar. 4, 2020) (holding that counsel was not ineffective for failing to "vigorously advise[]" the petitioner to accept the plea deal and noting that "there are countless ways to provide effective assistance" in this context, as counsel must balance "giv[ing] advice and, on the other [hand], coercing a plea" (citations, alteration, and quotation marks omitted)); *Rivera v. Colvin*, No. 15-

CV-9426, 2019 WL 2023744, at *5 (S.D.N.Y. May 8, 2019) (finding that the petitioner's counsel's actions were objectively reasonable where counsel "communicated the terms of the plea offer to [the p]etitioner, explained the offer, and recommended that [the p]etitioner accept" (record citation omitted)).

Moreover, given that Petitioner was aware of the plea deal and refused to take it because he wished to negotiate for King's freedom—which the Government said was "out of the question," (Rubin Aff. ¶ 9)—Petitioner has failed to show a reasonable probability that he would have taken a plea deal "but-for" any purported error committed by Rubin, *see Strickland*, 466 U.S. at 694.  Nor has Petitioner shown that the prosecution would have offered him a better deal had counsel done anything differently.  *See Madison v. Colvin*, No. 17-CV-7250, 2019 WL 3321748, at *14 (E.D.N.Y. July 24, 2019) (declining to find that counsel was ineffective where there was no evidence that the petitioner "declined to plead guilty *on the advice of counsel*" rather than because of his own internal motivations or beliefs), *appeal filed*, No. 19-2635, (2d Cir. Aug. 20, 2019); *United States v. Shulaya*, Nos. 17-CR-350, 19-CV-611, 2019 WL 1932581, at *7 (S.D.N.Y. Apr. 30, 2019) (holding that counsel was not ineffective in part because, in the face of documentation that the petitioner had rejected a plea offer during the criminal proceedings, the petitioner's "self-serving and uncorroborated assertions that his counsel had . . . failed to discuss his plea offer or the strength of the Government's case is palpably incredible" (citation and quotation marks omitted)).  Therefore, the Court also dismisses the portion of the Petition claiming that Rubin was constitutionally ineffective as to any potential plea agreement.

However, the Court does not have similar information as to Barket's interactions with Petitioner.  The Government's research of its own files was inconclusive as to whether any plea offer was extended to Petitioner while he was being advised by Barket or whether there is a

reasonable probability that Petitioner would have accepted the offer at that time. Moreover, unlike Rubin, Barket has not provided any affirmation detailing his experiences with Petitioner and his memory of the case. Accordingly, the Court cannot dismiss the Petition as to Barket's counselling regarding any potential plea agreement at this time. The Court finds Respondent's request for an order turning over Barket's case file regarding Petitioner to the Government to be a reasonable way to resolve this remaining question. If necessary, a hearing may be scheduled. *See Mateus*, 2020 WL 1046624, at *5 (noting that it is within the district court's discretion "to determine whether to hold a hearing," what the "scope and nature" of such hearing would be, and to "elect to investigate facts outside the record" if necessary (citations omitted)).

### 2. The Narcotics Convictions

Petitioner also argues that his conviction and sentence on Counts One through Four are invalid because the jury was not asked to find whether Petitioner knew the type of controlled substance at issue. (Pet. 20–22.) This argument fails. The Second Circuit has explicitly held that "where the defendant personally and directly participated in the drug transaction underlying [a] conspiracy charge, the government need not prove that the defendant had knowledge of either drug type or quantity." *United States v. Andino*, 627 F.3d 41, 47 (2d Cir. 2010). In other words, contrary to Petitioner's argument, there is no "type-specific" scienter requirement for Petitioner's narcotics convictions. *Id*. at 46; *see also United States v. McKenzie*, 686 F. App'x 77, 79 (2d Cir. 2017) (explaining that "knowledge can be established by evidence that a defendant knew that the substance with which he was dealing is *some* controlled substance regardless of whether he knew the particular identity of the substance" (emphasis added) (footnote, alteration, and quotation marks omitted) (citing *McFadden v. United States*, 576 U.S. 186 (2015))). Petitioner's cited cases are inapposite. In *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), the

Supreme Court held that a conviction for aggravated identity theft required the Government to show that the defendant knew that the means of identification at issue belonged to another person; it had nothing to do with the drug charges at issue here. *See* 556 U.S. at 656–57. And *McFadden* actually undermines Petitioner's argument because, there, in a case involving a controlled substance analogue, the Supreme Court held that the "knowledge requirement may be met by showing that the defendant knew he possessed a substance listed on the schedules, *even if he did not know which substance it was*." 576 U.S. at 186 (emphasis added). Accordingly, this argument is meritless and also dismissed.

### III. Conclusion

For the reasons discussed above, the Court dismisses Petitioner's Petition for Writ of Habeas Corpus on every ground except the allegation that counsel—namely, Barket—was ineffective for failing to communicate whether a plea offer had been extended by the Government. As neither the Government nor the Court has the records available to confirm whether a plea offer was given at the stage of the case during which Barket was involved, this Court cannot confirm that counsel was not constitutionally ineffective on this ground. Accordingly, although the Petition is dismissed on all the other grounds, it is hereby

ORDERED that the Government contact Bruce Barket, Esq. and notify him of this Order;

ORDERED that Bruce Barket, Esq. turn over his case file regarding Petitioner's underlying federal criminal case to the Government within 30 days, at which point, the Government should also provide a copy of the files to Petitioner;

ORDERED that the Government, within 30 days of receipt of the case file, submit a supplemental memorandum to the Court summarizing the contents of the file and demonstrating whether they are indicative of any constitutionally ineffective assistance of counsel;

ORDERED that Petitioner must submit any response to the Government's memorandum within 30 days of receiving such memorandum; and

ORDERED that the Government submit any reply to Petitioner's memorandum within 14 days of receiving it.

Because Petitioner has not yet made a substantial showing of the denial of a constitutional right and because the Petition has not yet been dismissed in full, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a defendant's good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and finding that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

SO ORDERED.

Dated: April 3, 2020
      White Plains, New York

                                                _____
                                                KENNETH M. KARAS
                                                UNITED STATES DISTRICT JUDGE